STATE OF CONNECTICUT *v.* JOSE TORRES
(AC 24403)

Schaller, Flynn and McLachlan, Js.

Argued March 23—officially released September 28, 2004

*Moira L. Buckley,* for the appellant (defendant).

*Christopher T. Godialis,* assistant state's attorney, with whom were *Patricia M. Froehlich,* state's attorney, and, on the brief, *Mark A. Stabile,* assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Jose Torres, appeals from the judgment of conviction of murder in violation of General Statutes § 53a-54a and capital felony in violation of General Statutes (Rev. to 1997) § 53a-54b (9). The defendant was sentenced to a term of life imprisonment without the possibility of release. This appeal, originally filed in our Supreme Court, was transferred to the Appellate Court by the Supreme Court pursuant to General Statutes § 51-199 (c).

On appeal, the defendant claims that the trial court improperly (1) refused to suppress his statements in a police report, (2) allowed the state to show evidence

that he was silent in response to certain questions that the police asked him, (3) allowed the state to enter into evidence his statements to the police, (4) failed to conduct a hearing pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), prior to admitting certain scientific evidence from an expert witness for the state and (5) admitted the scientific evidence. We affirm the judgment of the trial court.

A substantial amount of evidence was presented that indicated the defendant's guilt. Our summary of the evidence is not intended to be comprehensive. Rather, we state some of the relevant evidence on which the jury reasonably could have relied. The victim, Angelica Pedilla, was an eleven year old girl who lived with her mother in Willimantic. The defendant lived in an apartment complex on the same street as the victim. The victim had a part-time job in the afternoons delivering newspapers for the Willimantic Chronicle. Her route included the defendant's apartment complex. On August 13, 1998, the victim's mother returned from work early to take the victim shopping for school clothes. Midway through her route, the victim stopped at her home and met her mother, who told her to finish the route so that they could go shopping. After the victim left, the mother took a short nap and awoke at approximately 6 p.m. Realizing that the victim was not home yet, the mother became nervous and began searching for her, knocking on her neighbors' doors and checking the pool area of the apartment complex. The mother then telephoned the police. Shortly thereafter, the police began looking for the victim.

The police discovered the victim's body in the wooded area behind the Foster Drive apartment complex at 12:34 in the morning of August 14, 1998. She had been killed by a blunt force injury to her head and a sharp force applied to her neck. She had also sustained

various other wounds to her head, neck, back, wrist and knee. Her shorts and shoes were missing, and she was dressed in only a T-shirt and underwear. Green acrylic fibers on the victim's body were matched with fibers found on the defendant's pants, comb and blanket.

The police found the victim's shorts and shoes hidden in the basement of the Foster Drive apartment complex. Near the location of the shoes was a large bleach type stain. There was a small stain on the victim's shorts. The stain was tested by the Federal Bureau of Investigation's DNA analysis unit, which determined that the stain had the same mitochondrial DNA sequence as the defendant's blood, as well as the blood of 4.8 percent of the Hispanic population. Other forensic testing indicated that the defendant's DNA was part of the stain and that the "expected frequency of individuals who could contribute to the sample . . . were less than one in 300 million in the African-American [and] Hispanic populations, and approximately one in 280 million in the Caucasian population."

The police investigated the defendant, who lived at the Foster Drive apartment complex. Various witnesses placed the defendant at the apartment complex at the time of the killing. Further, the defendant told the police that he did not know the victim, despite the facts that his mother had baby-sat for the victim on several occasions, that he was friendly with the victim's mother and that he had twice complimented the victim on her appearance. In addition, the police discovered that approximately four minutes before they found the victim's body, the defendant called a friend and told him that the police had found a little girl's body behind his apartment building.

To reach the conclusion that the defendant was guilty, the jury also must have found, on the basis of

circumstantial evidence, that at some time in the afternoon of August 13, 1998, the defendant met with the victim, attacked her, took her to a private location, committed some form of sexual assault and killed her. This appeal followed. Additional facts will be set forth as necessary to resolve the claims on appeal.

I

The defendant claims that the court improperly refused to suppress his statements that were contained in a police report. The defendant argues that the police failed to inform him of his rights pursuant to *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), at the appropriate time and lacked probable cause to seize him and, thus, the statements he made were obtained either in violation of *Miranda* or were the fruit of an illegal seizure. The defendant argued at trial and on appeal that because of those alleged failures, any statement taken after 6:20 p.m. on August 17, 2001, should have been suppressed. We are not persuaded by the defendant's arguments because we agree with the trial court's conclusion that he was not in the custody of the police and, therefore, that the police were not required to give him *Miranda* warnings. We also agree that the police did not seize the defendant.

Additional facts are necessary to resolve the defendant's claim. Prior to trial, the defendant filed a motion to suppress his statements that were contained in a police narrative of an interview with him that later was admitted into evidence at trial. At the hearing on the motion, the following facts were adduced. After having obtained three written statements from the defendant on August 14, 1998, the police, on August 17, 1998, at approximately 2 p.m., decided to reinterview him. Because the police had kept the defendant under constant surveillance, they knew that he was at his mother's apartment. Dressed in plain clothes, they went to speak

to the defendant. The police explained that they "wanted to ask him some more questions with regards to the investigation." They also explained that "he wasn't under arrest, but that [they] would like him to accompany [them] back to the police department." The defendant agreed but, before he left, he asked the police to wait while he spoke to his family. The defendant went back inside for five minutes, returned outside and left with the police in their unmarked vehicle.

They arrived at the Willimantic police department at approximately 2:45 and proceeded to an interview room, which contained a table, a couple of chairs and a window overlooking the street. The defendant was not restrained in any way. After the two police officers and the defendant entered the room, the police advised him in Spanish of his rights and explained that he was not under arrest. Notably, the police officers testified that they did not consider the defendant to be in their custody. The defendant waived his rights and signed a waiver form written in Spanish.

During their interview of the defendant, the police offered him food and drink, but he chose only to have something to drink. The interview also stopped at least "a couple of times" to allow the defendant to use a bathroom. The defendant was not accompanied to the bathroom, which was almost directly across the hall from the interview room. The main entrance to the police station was approximately forty feet from the bathroom. During the interview, the defendant used a telephone twice.

The police began the interview by gathering background information about the defendant, who assisted the police in making some sketches. During the interview, the police returned to some areas of questioning three or four times. On several occasions, the police officers and the defendant raised their voices when

speaking to each other, but their voices quickly returned to conversational levels.

At approximately 6:20 p.m., the police officer conducting the interview told the defendant that "thus far, [the defendant] had lied to [them] about everything and that [he] knew [the defendant] was the person who killed [the victim]." Also in their narrative report of the interview, the police wrote: "[The defendant] did not say anything, he did not display any emotions including anger. [The police officers] sat for several minutes waiting for a response from him but he did not say anything at that time." The police then showed the defendant a photograph of the victim, and the defendant denied having seen her. The interview continued, with the police questioning the defendant about various parts of his story. At 12:10 a.m. on August 18, 1998, the defendant told the police that he wanted to call his wife and leave the police station. The defendant left the police station shortly thereafter.

The court ruled that the "motion to suppress is denied. . . . The court finds that there was no custodial interrogation at any time. The court finds that the defendant's presence at the police station and every statement made by the defendant on [August 17, 1998] were completely voluntary, and [the court] find[s] that by any possible standard of proof, including proof beyond a reasonable doubt. The court finds that *Miranda* warnings were not required, but even if they had been required, they were fully adequate to perform their constitutional function and did so." The defendant's statements were admitted at trial as part of the police narrative, which was redacted.

## A

The defendant argues that his statements should have been suppressed because the police failed to give him *Miranda* warnings at the appropriate time, i.e., at 6:20

p.m., when they accused him of killing the victim. We are not persuaded.

It is axiomatic that *Miranda* warnings are not required unless the defendant is in custody. "The defendant has the burden of proving custodial interrogation . . . before the state must prove that adequate warnings of the rights that inhere in the privilege against self-incrimination were given to the defendant and that the defendant's waiver of his rights was constitutionally valid . . . ." (Internal quotation marks omitted.) *State* v. *Johnson*, 241 Conn. 702, 718–19, 699 A.2d 57 (1997). "Two discrete inquiries are essential to determine custody: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, *would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.* . . . The first inquiry is factual, and we will not overturn the trial court's determination of the historical circumstances surrounding the defendant's interrogation unless it is clearly erroneous. . . . The second inquiry, however, calls for application of the controlling legal standard to the historical facts. . . . The ultimate determination of whether a defendant was subjected to a custodial interrogation, therefore, presents a mixed question of law and fact, over which our review is de novo." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Turner*, 267 Conn. 414, 434–35, 838 A.2d 947 (2004).

"[N]o definitive list of factors governs a determination of whether a reasonable person in the defendant's position would have believed that he or she was in custody." (Internal quotation marks omitted.) *State* v. *Atkinson*, 235 Conn. 748, 758, 670 A.2d 276 (1996). Our jurisprudence instructs, however, that "[w]hen [an] individual has not been arrested, a finding of custody *requires* some indication that the officer would not have heeded his or her request to depart." (Emphasis

added; internal quotation marks omitted.) Id., 760 n.18; see also *State* v. *Northrop*, 213 Conn. 405, 415, 568 A.2d 439 (1990); *Patterson* v. *Cuyler*, 729 F.2d 925, 929 (3d Cir. 1984).

The crucial and undisputed fact here is that as soon as the defendant expressed a desire to end the interview and to leave the police station, the police ended the interview and he left. The defendant, therefore, cannot show that a reasonable person would not have believed he was free to leave because he did, in fact, leave. "Although the subjective belief of the suspect . . . is not determinative . . . whether the subject has reasonable grounds to believe that he is under arrest is a factor of special significance." (Citations omitted.) *State* v. *Derrico*, 181 Conn. 151, 159, 434 A.2d 356, cert. denied, 449 U.S. 1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980); see also *State* v. *Lapointe*, 237 Conn. 694, 726, 678 A.2d 942 (applying *Derrico*'s language to custody issue), cert. denied, 519 U.S. 994, 117 S. Ct. 484, 136 L. Ed. 2d 378 (1996). A defendant's subjective belief is of even more paramount importance when he acts on the belief. There is no evidence in the record to support the contrary conclusion that the defendant's subjective belief that he could terminate the interview and leave would differ from the objective, reasonable person standard set forth in our case law. Further, the defendant cannot meet the burden set forth in *State* v. *Atkinson*, supra, 235 Conn. 760 n.18, that the police would not have heeded his request to leave because they did, in fact, honor his request.

B

The defendant also argues that his statements should have been suppressed because the police seized him when they accused him of killing the victim and, at the time of the accusation, they lacked probable cause to

seize him. Our determination that the defendant was not in custody guides our analysis.

At the outset, we note that the defendant makes his argument under both the fourth amendment to the United States constitution and article first, § 7, of the constitution of Connecticut. In *State* v. *Oquendo*, 223 Conn. 635, 652–53, 613 A.2d 1300 (1992), our Supreme Court interpreted the state constitution to provide broader protection than the federal constitution when determining if an individual has been seized. As such, our initial question is whether the defendant's argument satisfies the broader state constitutional standard.

To determine whether a seizure occurred, "we examine the effect of the police conduct at the time of the alleged seizure, applying an objective standard. Under our state constitution, a person is seized only if in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (Internal quotation marks omitted.) *State* v. *Greenfield*, 228 Conn. 62, 68, 634 A.2d 879 (1993). The definition of whether an individual has been seized is very similar to the definition of whether an individual is in custody. When examining the surrounding circumstances to determine whether a reasonable person would have believed he was free to leave, our Supreme Court has treated seizure and custody cases as interchangeable. In *State* v. *Lapointe*, supra, 237 Conn. 727, our Supreme Court, addressing whether the defendant was in custody, relied partially on *State* v. *Greenfield*, supra, 228 Conn. 62, which concerned seizure. When determining whether a defendant was in custody or whether he was seized, the essential question is whether a reasonable person would have believed he was free to leave. For the reasons stated in part I A, in which we determined that the defendant was not in custody, we conclude that he was not seized when the police accused him of killing the victim.

## II

The defendant also claims that the court improperly allowed the state to introduce evidence of his silence. The defendant argues that because he did not answer certain questions during the interview and because the state introduced the police report, stating, inter alia, that he had remained silent after those questions, the state violated the rules set forth in *Doyle* v. *Ohio*, 426 U.S. 610, 618, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976) (defendant's silence may not be used for impeachment), and *Wainwright* v. *Greenfield*, 474 U.S. 284, 292, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986) (defendant's silence may not be used as direct evidence of defendant's guilt). We disagree.

Additional facts are necessary to resolve the defendant's claim. At several points during the August 17, 1998 interview, the police asked the defendant questions that he did not answer. That attempted dialogue was contained in the police narrative that was admitted into evidence at trial. The defendant cites four different areas of the narrative:

"At approximately 1630 hours, I told [the defendant] that we interviewed the person he was with that day, Jose Santos, the owner of the gray Toyota [and] also told him that Jose Santos has never used the name Flaco and [the defendant] did not offer an explanation."

"We questioned [the defendant] further about the pickup truck and we asked him why he lied about that, he did not offer any explanation."

"At approximately 1820 hours . . . I also told him that if he didn't explain it to us, to the courts, her family and the community why this happened, people would form their own conclusions. After I said this [the defendant] did not say anything, he did not display any emotions including anger. We sat for several minutes

waiting for a response from him but he did not say anything at that time."

"At approximately 1930 hours, I asked [the defendant] what he was wearing on Thursday 8/13 and he stated he was wearing black jeans and a white T-shirt with a boxing logo . . . . [Officer] Perez reminded [the defendant] that on Friday 8/14 he told the detectives that he was wearing a blue shirt. . . . He stated that he is a mechanic and he changes a lot so he couldn't remember what he wore. I asked him how come he can remember it now on 8/17/98, and he couldn't remember it the very next morning, and he did not offer any explanation . . . ."

After each of the periods of silence, the defendant resumed responding to other questions. The police continued the interview until the defendant chose to leave early in the morning of August 18, 1998.

When reviewing a court's decision on a motion to suppress, we engage in a two part inquiry. We determine first whether the facts found by the court were clearly erroneous and then conduct a plenary review of the court's legal conclusions. See *State* v. *Velasco*, 248 Conn. 183, 188–89, 728 A.2d 493 (1999). It is well settled that the state may not use a defendant's post-*Miranda* silence either to impeach a defendant or as direct evidence against him. *State* v. *Plourde*, 208 Conn. 455, 466–67, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989). That rule "applies whenever *Miranda* warnings have been given regardless of an arrest or custody." Id., 466. Our Supreme Court has held, however, that the rule does not apply when the defendant merely pauses during an interview or alternates between remaining silent and speaking: "While a defendant may invoke his right to remain silent at any time, even after he has initially waived his right to remain silent, it does not necessarily

follow that he may remain 'selectively' silent." *State* v. *Talton*, 197 Conn. 280, 295, 497 A.2d 35 (1985); see also *State* v. *Casey*, 201 Conn. 174, 186, 513 A.2d 1183 (1986). In *Talton*, the defendant answered a question from the police by explaining, "I'd rather not tell you. I don't want to tell you." (Internal quotation marks omitted.) *State* v. *Talton*, supra, 296. In that case, the trial court permitted a police officer to testify at trial that the defendant had made those statements after having received the *Miranda* warnings. Id., 293–94. The court found that "the defendant had not invoked his right to silence; '[h]e just chose not to give that information.'" Id., 293. The Supreme Court affirmed the decision of the trial court. Id., 296.

In this case, there is no evidence that the defendant invoked his right to remain silent. There also is no evidence that he refused to answer all questions or, after remaining silent, did not speak again. Rather, the defendant was "selectively" silent. He resumed speaking after each period of silence. Further, the defendant elected to continue the interview for five hours after the last exchange during which he had responded with silence. Selective silence is not protected; *State* v. *Talton*, supra, 197 Conn. 295; and the defendant's behavior following the exchanges completely undermines his claim that he invoked the right to remain silent. The narrative was admitted properly because the defendant's silence was not protected silence.

### III

The defendant claims that the court improperly admitted into evidence his statements to the police. He argues that *State* v. *Rosa*, 170 Conn. 417, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 116 (1976), precluded the state from authenticating the statements. We disagree.

Additional facts are necessary to resolve the defendant's claim. The defendant claimed that he was fluent only in Spanish. Other witnesses testified that the defendant understood English, but did not testify that the defendant could read English. When the police interviewed the defendant, they utilized a police officer who was fluent in both English and Spanish to translate the questions. After the defendant answered a question, the translator would translate the answer to English, and another police officer, who was fluent only in English, functioned as a stenographer and copied the answers. During the course of a single day, the defendant made three statements, all of which were recorded in the manner previously described. After each statement was taken, the translator would read, in Spanish, the defendant's statement to the defendant. The defendant made minor changes to the first and third statements after hearing each one read. After the translator finished reading a statement and the defendant made corrections, the defendant, in the presence of the translator, signed the bottom of the statement. Regarding each statement, the translator testified that he translated the defendant's responses accurately, and that the defendant appeared to understand his questions and gave answers that were responsive to the questions. At trial, the state offered the statements into evidence through the translator. All three statements were admitted into evidence over the defendant's objection.

Our review of a trial court's evidentiary decisions is limited to whether the court abused its discretion. See *Hayes* v. *Decker*, 263 Conn. 677, 683, 822 A.2d 228 (2003). Before evidence may be admitted, it must be authenticated. "The law of evidence is agnostic; it does not accept items at face value." C. Tait, Connecticut Evidence (3d Ed. 2001) § 9.1.2, p. 753. Authentication requires that the proponent show "evidence sufficient to support a finding that the offered evidence is what

its proponent claims it to be." Conn. Code Evid. § 9.1
(a). "Both courts and commentators have noted that
the showing of authenticity is not on a par with the
more technical evidentiary rules that govern admissibil-
ity, such as hearsay exceptions, competency and privi-
lege. . . . Rather, there need only be a prima facie
showing of authenticity to the court. . . . Once a prima
facie showing of authorship is made to the court, the
evidence, as long as it is otherwise admissible, goes to
the jury, which will ultimately determine its authentic-
ity." (Citations omitted.) *State* v. *Berger*, 249 Conn. 218,
233, 733 A.2d 156 (1999). "In general, a writing may be
authenticated by a number of methods, including direct
testimony or circumstantial evidence." Id.; see Conn.
Code Evid. § 9-1 (a), commentary. The requirement of
authentication is satisfied when a "witness with per-
sonal knowledge [testifies] that the offered evidence is
what its proponent claims it to be." Conn. Code Evid.
§ 9-1 (a), commentary.

The defendant's argument relies heavily on *State* v.
*Rosa*, supra, 170 Conn. 417. At issue in *Rosa* was
whether "the trial court erred in ruling . . . that the
defendant's oral statement [to the police that was] made
[in a car] en route to Hartford was admissible . . . ."
Id., 424. Prior to his oral statement, the defendant in
*Rosa* had made a written statement implicating himself
in the crime. Id., 422. Because the defendant spoke only
Spanish, the police gave him *Miranda* warnings in both
English and Spanish. Id., 421. "The defendant then gave
his statement in Spanish to [a police officer fluent in
both English and Spanish], who in turn translated it to
a [police officer fluent only in English], who typed it
up in English." Id. "When the statement was completed,
it was read back to [the defendant] in Spanish, he cor-
rected some names and dates, initialled those changes,
and then signed all the pages of the statement." Id.,
421–22. The day following the written statement, the

defendant gave an oral statement implicating himself and providing additional details. Id., 422–23. The oral statement was never reduced to writing.

The trial court in *Rosa* suppressed the defendant's written statement, ruling that "[t]he procedure adopted in the taking of the [statement] has the appearance and the opportunity of impropriety and not the fairness which an accused is entitled to expect and receive in criminal proceedings . . . ." (Internal quotation marks omitted.) Id., 422. The court based its ruling on the "defendant's inability to speak or read the English language and the failure by the police to provide an 'impartial interpreter' to assist the defendant." Id. The court allowed the police to testify regarding the details of the subsequent oral statement. See id.

On appeal, the defendant in *Rosa* argued that the oral statement should have been suppressed "regardless of its voluntary nature . . . [because] he 'let the cat out of the bag' by his written confession at the police station [and] that his subsequent oral confession in the car was taken under similar circumstances and that it should have been excluded as the product of the earlier written confession which the trial court had suppressed." Id., 425. Our Supreme Court held that "[t]here is no evidence in the record to support a finding that either of the defendant's statements was obtained through duress, coercion, inducements and unlawful detention so as to become involuntary . . . . [T]here being no illegally obtained written confession, there can be no inadmissible direct product thereof." (Citation omitted.) Id., 425–26.

After resolving the issue, our Supreme Court went on to state that "[e]vidence concerning the circumstances at the police station revealed that the defendant spoke Spanish which [the officer fluent in both English and Spanish] translated into English for the police ste-

nographer, who understood only English and typed the confession in that language. Thus, the stenographer had no way of verifying whether the written statement was an accurate translation. It is clear that the written confession, although properly excluded since it was not authenticated, was not impermissibly obtained, and thus the defendant's subsequent oral confession in the car en route to Hartford was not the inadmissible product of a prior, involuntary confession." Id., 426–27. In a footnote, our Supreme Court stated that "[t]he fact that the confession was written in a language the defendant did not understand is not sufficient by itself to render inadmissible an otherwise authenticated document. . . . In the instant case, authentication could have been provided in several ways, e.g., if the police stenographer had understood both English and Spanish and had corroborated the accuracy of the written statement; if an impartial interpreter had translated the statement at the police station and testified in court as to its accuracy; or if the defendant, upon taking the [witness] stand out of the presence of the jury, had acknowledged committing the crime or otherwise indicated that he knew he was giving or signing a confession." (Citations omitted.) Id., 427 n.6.

In this case, the defendant argues that *Rosa* dictates that his three statements should not have been admitted because they were not authenticated properly. We are not persuaded. The statements in *Rosa* regarding authentication are dicta. Dictum is generally defined as "[a]n expression in an opinion which is not necessary to support the decision reached by the court. . . . A statement in an opinion with respect to a matter which is not an issue necessary for decision." (Citation omitted.) Ballentine's Law Dictionary (3d Ed. 1969). Our Supreme Court has instructed that dicta have no precedential value. See *St. George* v. *Gordon*, 264 Conn. 538, 547 n.10, 825 A.2d 90 (2003).

It bears reiteration that the issue in *Rosa* was only whether "the trial court erred in ruling . . . that the defendant's oral statement made en route to Hartford was admissible . . . ." *State* v. *Rosa*, supra, 170 Conn. 424. In reaching its conclusion, the court needed to determine if the oral statement was voluntary. Because of the arguments on appeal, the court also needed to consider whether the written statement was voluntary. Whether the written statement was authenticated properly was not, in any sense, related to whether it was voluntary. The discussion of authentication, therefore, was not "necessary to support the decision" or "an issue necessary for decision." Ballentine's Law Dictionary, supra. Likewise, the language in *State* v. *Rosa*, supra, 427 n.6, which set forth examples of how the statement *could have been* authenticated, is dictum. The court's own statement of the issue, which was that it was concerned with whether the oral confession was voluntary, compels us to reach the conclusion that the court's statements regarding authentication were dicta and, as such, have no precedential value. See generally *Tracy* v. *Allstate Ins. Co.*, 76 Conn. App. 329, 337, 819 A.2d 859 (2003) (dicta of Supreme Court not binding on Appellate Court), aff'd, 268 Conn. 281, 842 A.2d 1123 (2004).

In this case, because *Rosa* is not controlling and because the trial court heard testimony from the translator, who was able to present evidence that the proffered statements were the statements of the defendant, we conclude that the court did not abuse its broad discretion when it admitted the evidence. See Conn. Code Evid. § 9-1 (a), commentary (authentication proper when witness with personal knowledge testifies that evidence is what proponent claims it to be).

IV

The defendant's final claim is that the court failed to conduct a hearing pursuant to *State* v. *Porter*, supra,

241 Conn. 57, before admitting certain scientific evidence from an expert witness for the state. The defendant also argues that the evidence was not relevant or necessary. We conclude that the court properly held a hearing, but that it improperly shifted the burden to the defendant prior to the state's making the requisite showing of how the methodology applied to the facts of the case. We also conclude, however, that this error was harmless.

The following additional facts are necessary to the resolution of the defendant's claim. Prior to the presentation of the expert testimony, the defendant sought to exclude the testimony on the ground that it did not comply with *State* v. *Porter*, supra, 241 Conn. 57. The court offered the defendant the opportunity to question the expert, outside the presence of the jury, regarding the methodology used to reconstruct the crime scene, but the defendant refused to question the expert. The court verified that the defendant had the reconstruction report and that the defendant knew and understood the expert's anticipated testimony. After some discussion surrounding what *Porter* requires, the court stated: "You have his report. You've had it for, I presume, a significant period of time, and I'm begging you to just give me a clue as to the thrust of your claim, besides that there is no methodology. I'm just trying to focus on the thrust of your claim so I can fashion some sort of fair hearing that will get this case moving in an efficient fashion. I'm not going to have [the expert] testify in total, twice. I mean, [the expert] is here. You can call him, and that's the way I usually have these things done to save time. The defense simply calls the opposing witness and treats the witness—cross-examines the witness and points out or attempts to point out the defect in the particular methodology or the application of the methodology to the particular test performed. That's all. But you seem unwilling to do

that, and so I'm sort of puzzled as to where we go." The defendant refused the court's offer. The court and the defendant then agreed to have the expert testify before the jury; the defendant would object when necessary and have the opportunity to voir dire the witness. The court explained in relevant part: "The state will call [the expert], qualify him, and if you wish to voir dire [the expert] on any credentials or lack of methodology, I will permit you to interrupt the testimony of [the expert] for voir dire . . . ."

The state called the expert to testify and reviewed his qualifications, which were extensive. The expert testified then as to some of the conclusions he could form from evidence that a person had been slashed by a knife. He also explained the differences between primary and secondary crime scenes, as well as full, partial and limited crime scene reconstructions.

The following colloquy in relevant part then occurred:

"[Defense Counsel]: Objection, Your Honor.

"The Court: Grounds.

"[Defense Counsel]: Grounds, Conn. Code Evid. § 7-2, testimony by experts specifically relying upon the entire text of the commentary to that rule, Your Honor. Specifically, as it applies to *Porter*.

"The Court: Well, could—it is an insufficient rule of evidence objection to stand up and say I object because the commentary to § 7.2, which is a full newspaper column, means it's not admissible. Section 7-2 says that '[a] witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue.' So, I

need you to tell me which part of § 7-2 you claim has not been met?

"[Defense Counsel]: The section of § 7-2 specifically in the commentary to the rule, Your Honor, which refers the court to the Supreme—state of Connecticut Supreme Court, holding in *Porter*, Your Honor.

"The Court: That's the total specificity?

\* \* \*

"[Defense Counsel]: The commentary indicates that there are several factors cited by the Supreme Court in *Porter*, which the court must consider before admitting . . . expert opinion testimony, Your Honor. The court must determine whether or not the reasoning or methodology underlying the evidence is scientifically valid. With respect to that holding of the Connecticut Supreme Court, Your Honor, the defendant objects to the admission of this witness' expert—this witness' opinion testimony, Your Honor.

"The Court: Do you wish to voir dire as to methodology?

"[Defense Counsel]: Yeah, I'm not the proponent of the evidence. I'm making the objection, Your Honor.

"The Court: Do you or do you not wish to voir dire? I didn't ask you why—

"[Defense Counsel]: I do not.

"The Court: —you do not if you do not.

"[Defense Counsel]: I do not, Your Honor.

"The Court: Very well. The objection is overruled. It is my ruling that there is sufficient foundation as to methodology at this point, absent the defense offering some questions to the contrary."

After that colloquy, defense counsel objected several more times, but consistently refused to voir dire the expert. Notably, in ruling on the defendant's posttrial motion for a judgment of acquittal, the court explained that it had given the defendant "the opportunity of raising an objection pursuant to an oral motion in limine. The state made, in my opinion, an adequate preliminary, predicate foundation for the testimony of [the expert]. The way this works in the real world is the defense objects and then by questioning—or the defense can object and argue, that there is an insufficient foundation . . . . And I ruled on the record before me that the evidence satisfied me that [the expert's] proposed testimony was well within any standard for expert testimony in our code of evidence. . . . I offered you the additional opportunity, which many counsel take, to get an advanced opportunity to cross-examine [the expert] in the early scheduled motion in limine . . . but you declined to take that opportunity."

We review a court's decision to admit evidence only to determine whether it abused its broad discretion. *Hayes* v. *Decker*, supra, 263 Conn. 683. "Concerning expert testimony specifically, we note that the trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed." (Internal quotation marks omitted.) Id.

When proffered expert testimony in based on novel techniques, "the scientific evidence that forms the basis for the expert's opinion must undergo a validity assessment to ensure reliability." Id., 684. That validity assessment is commonly referred to as a "*Porter* hearing," which allows the judge to examine the underlying methodology to determine if it meets the standards set forth in *State* v. *Porter*, supra, 241 Conn. 57. To satisfy *Porter*, the proponent of the evidence must show that "the

reasoning or methodology underlying the [scientific theory or technique in question] is scientifically valid and . . . that reasoning or methodology properly can be applied to the facts in issue." (Internal quotation marks omitted.) Id., 64. *Porter* was based largely on *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), in which the United States Supreme Court held that the proper inquiry focused on the underlying methodology and not on whether there had been a general acceptance of the technique. See *State* v. *Porter*, supra, 84–85. Notably, our Supreme Court did not abandon the general acceptance test completely, stating that "if a trial court determines that a scientific methodology has gained general acceptance, then the *Daubert* inquiry will generally end and the conclusions derived from that methodology will generally be admissible." Id., 85. The key distinction after *Porter* is, however, that even if the technique has not gained general acceptance, it may be admissible if the underlying methodology is appropriate. Id.

Regarding whether a hearing actually occurred, in *Doe* v. *Thames Valley Council for Community Action, Inc.*, 69 Conn. App. 850, 875, 797 A.2d 1146, cert. denied, 261 Conn. 906, 804 A.2d 212 (2002), we held that a court is not "obligated, despite the absence of any express request, to hold a separate hearing outside the presence of the jury upon the defendants' objection to expert testimony under *Daubert. Porter* does not impose such an obligation on the trial court." Similarly, federal courts applying *Daubert* have held that "[n]owhere . . . does the Supreme Court mandate the form that the inquiry into relevance and reliability must take . . . . Although the Court stated that the inquiry is a 'preliminary' one, to be made 'at the outset,' . . . this does not mean that it must be made in a separate, pretrial hearing, outside the presence of the jury. . . . [T]he [Supreme] Court did not intend the imposition of any

one method of discharging the gatekeeping duty" that falls on the trial court when scientific evidence is proffered. (Citations omitted; internal quotation marks omitted.) *United States* v. *Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000). It is thus clear that *Porter* imposes a burden, but it is a flexible burden focused not on the form of the hearing, but rather on the goal, i.e., to determine whether the methodology is sound. On the basis of that jurisprudence, we conclude that a *Porter* hearing may be held before the jury. In this case, the court held a *Porter* hearing.

The evidence adduced at the hearing, however, was insufficient to justify its admission. The court properly required the state to put on evidence of the methodology. The state offered the barest of evidence concerning the general methodology. The state did not offer any evidence of how the methodology applied to the facts of the case. When the defendant raised his objection, the court improperly asked the defendant to explain how the methodology was deficient, *prior to the state explaining how the methodology even applied.* The defendant *could not* prove how the methodology was deficient prior to the state showing how the methodology would be applied. Under *Porter*, the proponent of the evidence must show how it applies to the facts of the case before the evidence may be admitted. After the proponent satisfies its burden, it is proper and desirable for the court to allow the party opposing admission of the scientific evidence to offer evidence in rebuttal. It is improper to require the party opposing the admission of the scientific evidence to offer rebuttal evidence before the proponent of the evidence carries its burden. Because the court misapplied the law, it abused its discretion when it admitted the evidence without the state's having shown how the evidence applied to the facts of the case and when the court prematurely required the defendant to offer rebuttal evidence.

A court's failure to conduct a *Daubert* hearing properly has been subject to harmless error analysis; see *United States* v. *Turner*, 285 F.3d 909, 913–14 (10th Cir.), cert. denied, 537 U.S. 895, 123 S. Ct. 180, 154 L. Ed. 2d 163 (2002); *United States* v. *Marji*, 158 F.3d 60, 62 (2d Cir.), cert. denied, 525 U.S. 1048, 119 S. Ct. 607, 142 L. Ed. 2d 547 (1998); and we see no reason not to subject improprieties involving *Porter* to harmless error analysis. Cf. *State* v. *Grenier*, 257 Conn. 797, 806–807, 778 A.2d 159 (2001) (applying harmless error analysis to expert testimony). "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Cabral*, 75 Conn. App. 304, 317, 815 A.2d 1234, cert. granted on other grounds, 264 Conn. 914, 826 A.2d 1158 (2003). "In order to establish the harmfulness of a trial court ruling, the defendant must show that it is more probable than not that the improper action affected the result." (Internal quotation marks omitted.) *State* v. *Russo*, 62 Conn. App. 129, 137, 773 A.2d 965 (2001). "It is well established that if erroneously admitted evidence is merely cumulative of other evidence presented in the case, its admission does not constitute reversible error." (Internal quotation marks omitted.) *State* v. *Calderon*, 82 Conn. App. 315, 326, 842 A.2d 1177, cert. denied, 270 Conn. 905, 853 A.2d 523 (2004).

We conclude that the admission of the evidence from the expert was harmless. The expert's testimony was based completely on other evidence that had been admitted properly. Further, the jury had before it evidence that the defendant's DNA was found on the victim's shorts. There also was consciousness of guilt evidence as well as the telephone call in which the defendant revealed that he knew that a girl had been killed and found behind his apartment building prior to the police locating the victim. We cannot say that

the admission of this evidence from the expert was likely to affect the result of the trial. We need not address whether the evidence was relevant or necessary in light of our resolution of the issue.

The judgment is affirmed.

In this opinion the other judges concurred.