STATE OF CONNECTICUT v. JOSE MIGUEL ROSA

HOUSE, C. J., COTTER, LOISELLE, BOGDANSKI and BARBER, Js.

418

Argued December 10, 1975—decision released March 23, 1976

*Maxwell Heiman,* special public defender, with
whom, on the brief, were *Louis P. Kocsis* and
*William J. Eddy,* for the appellant (defendant).

*Arnold M. Schwolsky*, assistant state's attorney, with whom, on the brief, was *George D. Stoughton*, state's attorney, for the appellee (state).

COTTER, J.  The defendant has appealed, after trial by a jury, from his conviction of murder of Luis Rios Moran while acting with one or more persons in committing or attempting to commit robbery, in violation of then § 53a-54 (a) (2) of the General Statutes.  We consider his assignments of error in rulings made during the trial and in the charge to the jury.[1]

I

From a review of the evidence the jury could have reasonably found the following facts:

On August 9, 1973, between 10:00 and 11:30 p.m., the decedent and the defendant had been gambling with dice and cards in the decedent's apartment on Main Street in Hartford.  Also present at that game were a neighbor of the decedent, Benjamin Morales, and a friend of the defendant, Lydia Sanchez, also known as Carmen.  During the course of the game, the decedent succeeded in winning all of the defendant's money, and when Morales left the other three at the apartment between 11:15 and 11:30 p.m., Moran was still alive.

The next morning, August 10, 1973, after some people had begun to ask after the decedent, neighbors investigated and found him lying dead on the bed in his apartment, with one of his pockets turned inside out, and a bloody lead pipe lying not far

---

[1] The defendant has abandoned his preliminary assignments of error in the court's denial of motions for a directed verdict and to set aside the verdict.

from his body. An autopsy revealed that death had been caused by severe multiple blows to the head, apparently from the lead pipe.

Subsequently, on August 13, 1973, Carmen Sanchez's 21-year-old son, Victor Millan, saw his mother and the defendant in an apartment in Newburgh, New York. Millan on that occasion accompanied the defendant to a garage where the defendant told Millan that he had hit the decedent with a lead pipe and taken his money. Later that evening, the defendant, Millan and Carmen Sanchez, along with her daughter, returned to Carmen Sanchez's apartment on Bedford Street in Hartford. While in the apartment, Millan heard the defendant tell Mrs. Sanchez that she had had nothing to do with what had happened but that "perhaps the police might catch you . . . and you might say something that you're not supposed to say." Later that night the defendant again told Millan that he had quarreled with Moran, taken the pipe and hit him over the head, but denied that Moran was dead when he left the apartment.

Several hours later, at about 3:30 a.m. on August 14, 1973, the defendant persuaded Millan and a friend to drive him back to Newburgh, which they did, dropped him off, and then returned to Hartford. Later that day, Millan went to the Hartford police and related what the defendant had told him.

The next day, August 15, 1973, Millan accompanied two Hartford police officers back to Newburgh, where they arrested the defendant at a gas station sometime after 3 p.m. The defendant, during the time he was in Newburgh, was taken to the police station and then to court, where he was advised by the judge that he had a right to

counsel and to remain silent and was urged by the judge not to say anything. Since the defendant did not understand much English, one of the Hartford policemen, Pedro J. Velazco, translated the court's warning into Spanish for him. After the court proceedings, he was taken back to the Newburgh police station, where he remained overnight.

In the course of the trial, the court, in the absence of the jury, heard evidence concerning the admissibility of a written confession which had been given later that night at the Newburgh police station by the defendant in Spanish and translated into English by Officer Velazco to a stenographer. The evidence taken during the hearing on the motion to suppress this confession disclosed the following:

At 8:40 p.m., four hours after the court hearing, the defendant told Officer Velazco that he was ready to make a formal statement. The officer thereupon read appropriate warnings to him both in English and in Spanish from a printed sheet used by the Newburgh police, which sheet the defendant signed.[2] The defendant then gave his statement in Spanish to Officer Velazco, who in turn translated it to a Newburgh police officer, who typed it up in English. At one point during the statement, the defendant rose from his seat and gestured in a manner similar to a baseball batter hitting a ball. When the statement was completed, it was read

[2] The defendant had been given the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, earlier that day after he returned from court, whereupon he told Officer Velazco that two other persons had attacked the decedent and that he had tried to help but got scared and left for Newburgh. Officer Velazco told him he did not believe this story and broke off the conversation.

back to him in Spanish, he corrected some names and dates, initialled those changes, and then signed all the pages of the statement.

In open court, when ruling on the motion to suppress the written signed confession, the court stated that it was "required to suppress the confession, not based upon" the credibility or truthfulness of the accused and the police officers, "but based on the procedure employed in the taking of the statement." After discussing only the events and details of the translation process the court concluded: "[T]he procedure adopted in the taking of the confession has the appearance and the opportunity of impropriety and not the fairness which an accused is entitled to expect and receive in criminal proceedings," noting in particular the defendant's inability to speak or read the English language and the failure by the police to provide an "impartial interpreter" to assist the defendant.

Evidence concerning all subsequent events was heard by the jury, and revealed that after the defendant's written confession was made, the two Hartford policemen returned Carmen Sanchez to her Hartford apartment. They returned to Newburgh the next day, at which time the defendant was presented in another court in Goshen, New York, for extradition, and then turned over to the custody of the two Hartford policemen. That afternoon, the three started back towards Hartford, stopping at a restaurant for lunch on the way. The two officers were riding in the front, and the defendant, unmanacled, was in the back seat. At about 5:30 p.m., while en route, the defendant initiated a conversation with Officer Velazco in Spanish in

the course of which he asked what had happened to Carmen Sanchez and was told that she had been returned to Hartford the previous evening and that she had not been arrested.[3] At this point, according to Officer Velazco, the defendant volunteered that "he wanted to tell me the truth now and that he told me that he had acted alone in the apartment with Luis Moran but it only had been because of the insistence of Carmen Rivera Sanchez. . . . He told me that she had been making signs behind Luis Moran's back for him to hit him over the head and take his money, by whispers and signs." The defendant said that he hit Moran with the pipe, took $187, ran down the stairs and drove off to Newburgh with Carmen Sanchez. This oral statement was translated by Officer Velazco from Spanish into English for his fellow officer. Carmen Sanchez did not testify, even though she was apparently available to do so provided she was granted immunity, and the defendant did not testify on his own behalf during the defense's case-in-chief.[4]

---

[3] As with the written statement taken at the police station, the trial court first conducted a hearing out of the presence of the jury to determine whether this oral statement was admissible. Once the court found the oral statement to be a voluntary utterance, Officer Velazco repeated his testimony in the presence of the jury. Details to which Officer Velazco did not testify before the jury included Carmen Sanchez's statement to him that she had not been in the apartment during the killing and had called the defendant a "dirty liar" if he said that she had. (The court excluded these statements of Carmen Sanchez to Officer Velazco from the jury on the ground that they were hearsay.) It was upon hearing this denial that the defendant "stopped . . . didn't say nothing [sic] for a while," then admitted to killing Moran in the manner described by Officer Velazco to the jury.

[4] At the court hearing on admissibility of the written confession the defendant testified solely to rebut Officer Velazco; denying he confessed to the killing, and claiming he was frightened while confined in the Newburgh police station.

## II

The defendant claims the trial court erred in ruling (1) that the defendant's oral statement made en route to Hartford was admissible, and (2) that the state's attorney could state in his closing argument that the defendant had fled when defense counsel's closing had made no reference to flight. We find no error in the court's rulings on these issues.

## A

The defendant challenges the admissibility of his oral confession to Officer Velazco, claiming that it was taken under similar circumstances as the written confession, which the court suppressed, and thus should have been excluded as a direct product of that earlier statement.

The trial transcript clearly indicates, as the trial court ruled, that the oral confession the defendant made while riding back to Hartford was voluntary in view of the totality of the circumstances, *State* v. *Hassett,* 155 Conn. 225, 230, 230 A.2d 553; *State* v. *Traub,* 151 Conn. 246, 196 A.2d 755, cert. denied, 377 U.S. 960, 84 S. Ct. 1637, 12 L. Ed. 2d 503; *Krooner* v. *State,* 137 Conn. 58, 61, 75 A.2d 51. "The state of mind which renders such a statement involuntary and hence inadmissible is that induced by mistreatment, threats, promises, physical or mental abuse which deprives an otherwise rational mind of the exercise of its free will and powers of decision and discernment." *State* v. *Cooper,* 10 N.J. 532, 552, 92 A.2d 786. See 3 Wharton, Criminal Evidence (13th Ed. Torcia) § 671; annot., 23 A.L.R.2d 919, 921; McCormick, Evidence (2d Ed.) § 149 (c).

The record in this case is devoid of any indication that the defendant was subjected to this sort of coercion or intimidation either while he was riding back to Hartford or at any other time while he was in police custody. It is apparent that he volunteered the incriminating statement to Officer Velazco after being told, in response to his inquiry, that Carmen Sanchez had denied any complicity in the killing and after it appeared to him that he might be the only one taking the blame. Thus the trial court was correct in finding the defendant's oral confession to be a voluntary utterance and in admitting Officer Velazco's testimony.

The defendant claims, however, that his oral confession should have been suppressed, regardless of its voluntary nature. He argues that he "let the cat out of the bag" by his written confession at the police station, that his subsequent oral confession in the car was taken under similar circumstances and that it should have been excluded as the product of the earlier written confession which the trial court had suppressed.[5] We cannot agree. There is no

[5] This "cat out of the bag" theory, which originated in its modern form in *United States* v. *Bayer*, 331 U.S. 532, 540–41, 67 S. Ct. 1394, 91 L. Ed. 1654, reh. denied, 332 U.S. 785, 68 S. Ct. 29, 92 L. Ed. 368, provides that where the prosecution seeks to use a confession which was uttered after an earlier one not found to be voluntary, the prosecution has the burden of proving that the second confession was not a product of improper threats or coercion and that it was not directly produced by the existence of the earlier confession. *Darwin* v. *Connecticut*, 391 U.S. 346, 350–51, 88 S. Ct. 1488, 20 L. Ed. 2d 630. (Opinion of *Harlan, J.*, concurring in part and dissenting in part.) Whether the second confession is admissible is to be determined in view of the totality of the circumstances, considering especially whether there was a break in the stream of events between the two statements. Ibid; *Clewis* v. *Texas*, 386 U.S. 707, 87 S. Ct. 1338, 18 L. Ed. 2d 423. The rationale for this procedure stems from the recog-

evidence in the record to support a finding that either of the defendant's statements was obtained through duress, coercion, inducements and unlawful detention so as to become involuntary, see *United States* v. *Carignan,* 342 U.S. 36, 72 S. Ct. 97, 96 L. Ed. 48; there being no illegally obtained written confession, there can be no inadmissible direct product thereof.

The written confession was an extrajudicial statement offered by the state for the truth of its contents. As such, it required proper authentication, which the state failed to establish, thus justifying exclusion of the written confession. 3 Wharton, op. cit. § 665; 23 C.J.S., Criminal Law, § 833 (a). Evidence concerning the circumstances at the police station revealed that the defendant spoke Spanish which Officer Velazco translated into English for the police stenographer, who understood only English and typed the confession in that language. Thus, the stenographer had no way of verifying whether the written statement was an accurate translation. It is clear that the written confession, although properly excluded since it was not authen-

nition that once a suspect has "let the cat out of the bag" with his first involuntary confession, he may think he has nothing to lose by repeating it voluntarily at a later time. If the first confession was improperly obtained, the prosecution should not be allowed to introduce subsequent voluntary statements which were direct products of the first one. *Darwin* v. *Connecticut,* supra. In other words this theory operates to exclude the "fruit of the poisonous tree" when the "poisonous tree" is a fifth amendment violation just as evidence seized as a result of a fourth amendment violation may also be excluded under the same rationale. *Harrison* v. *United States,* 392 U.S. 219, 222, 88 S. Ct. 2008, 20 L. Ed. 2d 1047; *Wong Sun* v. *United States,* 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441; *Nardone* v. *United States,* 308 U.S. 338, 60 S. Ct. 266, 84 L. Ed. 307; *Silverthorne Lumber Co., Inc.* v. *United States,* 251 U.S. 385, 40 S. Ct. 182, 64 L. Ed. 319.

ticated,[6] was not impermissibly obtained, and thus the defendant's subsequent oral confession in the car en route to Hartford was not the inadmissible product of a prior, involuntary confession.[7]

Under the circumstances, the so-called cat out of the bag concept is equally inapplicable, contrary to the claim of the defendant, on the ground that the defendant had voluntarily admitted his criminal culpability beforehand in two statements he made to the witness, Millan, and in a conversation with

[6] The fact that the confession was written in a language the defendant did not understand is not sufficient by itself to render inadmissible an otherwise authenticated document. 3 Wharton, op. cit. § 665. See also State v. Demareste, 41 La. Ann. 617, 6 So. 136. In the instant case, authentication could have been provided in several ways, e.g., if the police stenographer had understood both English and Spanish and had corroborated the accuracy of the written statement; if an impartial interpreter had translated the statement at the police station and testified in court as to its accuracy; or if the defendant, upon taking the stand out of the presence of the jury, had acknowledged committing the crime or otherwise indicated that he knew he was giving or signing a confession. State v. Walker, 269 N.C. 135, 138, 152 S.E.2d 133; 23 C.J.S., Criminal Law, § 833 (b).

[7] Since the written statement was not authenticated, the only testimony regarding the defendant's confession which might have been admissible was oral testimony from Officer Velazco, the only witness at the police station who was conversant with both Spanish and English. State v. Cooper, 10 N.J. 532, 564, 92 A.2d 786; 23 C.J.S., Criminal Law, § 833 (b). It is, of course, permissible for a police officer to testify to a defendant's oral, voluntary and untainted confession, even if the two were speaking in a foreign language. Further, if Officer Velazco had testified as to what the defendant told him at the police station, it would have been proper for him to refer to the English translation he had dictated in order to refresh his memory. State v. Rios, 17 N.J. 572, 600, 112 A.2d 247; State v. Cleveland, 6 N.J. 316, 329, 78 A.2d 560; 23 C.J.S., Criminal Law, § 833 (b). Such a result, i.e., excluding an unverified written confession, but allowing the officer to testify to what the suspect had told him orally, is a reflection of the underlying reality that once the statement of an accused "has been reduced to writing it has a tendency to be regarded in a more trustworthy light than an oral statement" by an interrogating officer. Commonwealth v. Insano, 268 Pa. 1, 4, 110 A. 248; 3 Wharton, op. cit. § 665.

Carmen Sanchez which Millan overheard, all of which occurred prior to Rosa's arrest and before he gave the written confession. Millan's statement to the Hartford police concerning these events constituted the basis for Rosa's arrest and subsequent questioning by the Hartford police.

## B

In his final argument to the jury, the state's attorney asked the jury, "Is there any question in your minds but what Mr. Rosa and Carmen Sanchez fled from Connecticut to New York, to Newburgh, New York? Is there any question about that?" to which question defense counsel objected. After this argument was completed, defense counsel moved for a mistrial on the ground that the state's closing argument should be limited to rebuttal of issues raised in defense counsel's argument and that since he had not mentioned flight in his argument to the jury, the prosecution should not be permitted to do so in its closing argument. Defense counsel did, however, acknowledge that the state had argued the issue of flight in its opening argument. The trial court denied the motion for a mistrial, and on appeal the defendant has claimed this ruling as error.

Section 54-88 of the General Statutes provides, "[i]n any criminal trial, the counsel for the state shall be entitled to open and close the argument." There is no rigid requirement that a prosecutor's final summation must be limited solely to rebuttal of matters raised in the defendant's argument. "The trial court is invested with a large discretion with regard to arguments of counsel, and we should interfere only where that discretion was clearly exceeded or abused to the manifest injury of some

party." *Amato* v. *Sawicki*, 159 Conn. 490, 496, 271 A.2d 80. See also *Begley* v. *Kohl & Madden Printing Ink Co.*, 157 Conn. 445, 452, 254 A.2d 907; *Cascella* v. *Jay James Camera Shop, Inc.*, 147 Conn. 337, 343, 160 A.2d 899; *James* v. *Bowen*, 83 Conn. 702, 706, 78 A. 420. Although it is preferable for a state's attorney to limit his closing argument to a rebuttal of issues raised in the defendant's argument, *Chandler* v. *Miles*, 38 Del. 431, 193 A. 576, a single repetition of a matter he noted in his opening statement which defense counsel did not mention in his closing argument cannot be held to be erroneous in the instant case, 88 C.J.S., Trial, § 169; 75 Am. Jur. 2d, Trial, § 214, nor did the trial court err in refusing to grant a mistrial. " ' "The general principle is that a mistrial should be granted only as a result of some occurrence on the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial. *Izzo* v. *Crowley*, 157 Conn. 561, 565, 254 A.2d 904; *Ferino* v. *Palmer*, 133 Conn. 463, 466, 52 A.2d 433." ' *State* v. *Grayton*, 163 Conn. 104, 112, 302 A.2d 246, cert. denied, 409 U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495. . . . '[T]he trial court is the arbiter of the many circumstances which may arise during a trial.' *State* v. *Marquez*, 160 Conn. 47, 52, 273 A.2d 689. 'The trial court has a wide discretion in passing on motions for mistrial.' *State* v. *Savage*, 161 Conn. 445, 449, 290 A.2d 221." *State* v. *Brown*, 169 Conn. 692, 703, 364 A.2d 186. We find no abuse of discretion in the trial court's refusal to grant a mistrial based on the state's attorney's reference to flight in his final argument.

## III

The defendant also claims error in certain portions of the court's instructions to the jury, specifi-

cally, (1) the failure of the court to charge that the jury could draw an unfavorable inference from the state's decision not to offer Carmen Sanchez as a witness, (2) the instruction concerning flight, and (3) the court's mention of "other participants," accessories and the possibility of separate trials for any such persons. We find no error in the court's jury instructions in these respects.

## A

For several reasons, the facts of this case do not lend themselves to the invocation of the rule discussed in *State* v. *Brown,* 163 Conn. 52, 58, 301 A.2d 547, and *State* v. *Annunziato,* 169 Conn. 517, 538–39, 363 A.2d 1011, that it is fair for counsel to comment and for the court to charge that an unfavorable inference may be drawn from the failure of the opposing party, in this instance the state, to produce an available witness who would naturally be expected to testify, viz., Carmen Sanchez. It appears from the record that if called, she would refuse to testify and would invoke her fifth amendment right against self-incrimination unless the state granted her immunity from a robbery charge which was based on the statement of the defendant inculpating her in the events of the present case. The state rejected her request for immunity. The record further discloses that if she waived her fifth amendment right, she might deny being in the apartment at the time the alleged homicide had taken place. In either event, her presence on the witness stand under these circumstances may have been extremely unfavorable to the defendant or may have prompted a defense claim that the state's decision to call her as a witness, knowing that she may invoke her fifth amendment privilege, was so prejudicial as to create

error. See *State* v. *Moynahan,* 164 Conn. 560, 586, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219; annot., 86 A.L.R.2d 1443; Wharton, op. cit. § 645.

"To take advantage of this rule permitting an adverse inference, the party claiming the benefit must show that he is entitled to it. . . . When a witness is equally available to both parties no inference unfavorable to either may be drawn." *State* v. *Brown,* 169 Conn. 692, 704–705, 364 A.2d 186; see *Queen* v. *Gagliola,* 162 Conn. 164, 169, 292 A.2d 890; *Turner* v. *Scanlon,* 146 Conn. 149, 161, 148 A.2d 334. See also *Yavis* v. *Sullivan,* 137 Conn. 253, 263, 76 A.2d 99; *Billeci* v. *United States,* 184 F.2d 394 (D.C. Cir.); see 75 Am. Jur. 2d, Trial, § 771. Under the circumstances of this case, where the witness Sanchez was apparently available to both parties and, if called, would refuse to answer any questions, thus causing prejudice to the defendant, we cannot say that the defendant has shown that he is entitled to the requested charge or an opportunity to argue to the jury that an unfavorable inference may be drawn from the failure of the state to produce Carmen Sanchez as a witness. The state fulfilled its obligation to ensure that all evidence tending to aid in the ascertaining of the truth be laid before the court when it made known to the court and the defendant the existence of the witness and the knowledge it had concerning her refusal to testify. *State* v. *Mitchell,* 169 Conn. 161, 164, 362 A.2d. 808. Cf. *State* v. *Moynahan,* supra, 585–88.

B

The defendant also objected to the court's charge pertaining to the principle of admission of guilt by

conduct such as flight[8] on the ground that a charge concerning flight is permissible only if there is proof the defendant knew he was wanted by the police, relying on this court's opinion in *State* v. *Mayell,* 163 Conn. 419, 311 A.2d 60. The facts in *Mayell,* however, were considerably different from those here. In *Mayell,* the defendant was seen operating a car at 6 p.m. in New York City, and the car was found abandoned at midnight in Watertown, Connecticut with the keys in the ignition. There was, however, no evidence to indicate that the defendant had been in Watertown at the time of the crime with which he was charged. These circumstantial events, even when coupled with the fact that the police could not find the defendant, were held by this court to be insufficient to justify a charge concerning flight. Id., 425.

By contrast, the facts regarding flight in the instant case were far more substantial and placed the defendant in Hartford in the decedent's apartment at the time in question. The court's charge was permissible, inasmuch as there was testimony from Officer Velazco to indicate that after the defendant hit Moran with the lead pipe, he immediately drove from the decedent's apartment in Hartford to Newburgh where he was found by the witness Millan and by the Hartford police officers.

Plainly, this evidence afforded a substantial basis for the jury to consider flight. "Flight, when unex-

[8] The court charged the jury, in relevant part, as follows: "The conduct of a person in leaving the scene of a crime, if proven that he was in fact at the scene of the crime, may be considered in determining his guilt since if unexplained, it tends to prove a consciousness of guilt. However, flight, if shown, is not conclusive. Nor does it raise a legal presumption of guilt, but is to be given the weight to which the jury thinks it is entitled under the circumstances shown."

plained, tends to prove a consciousness of guilt." *State* v. *Beaulieu,* 164 Conn. 620, 632, 325 A.2d 263; *State* v. *Miller,* 154 Conn. 622, 628, 228 A.2d 136; *State* v. *Ford,* 109 Conn. 490, 496, 146 A. 828. "The flight of the person accused of crime is a circumstance which, when considered together with all the facts of the case, may justify an inference of the accused's guilt. It does not raise a presumption of guilt." 1 Wharton, op. cit. § 143, p. 243; accord, 2 Wigmore, Evidence (3d Ed.) § 276; McCormick, op. cit. § 271 (c); see annot., 25 A.L.R. 886. In particular, such an instruction is justified in view of the testimony here that the defendant left the state immediately upon committing the crime. *State* v. *Barton,* 258 Iowa 924, 929–30, 140 N.W.2d 886; *State* v. *Robinson,* 170 Iowa 267, 283, 152 N.W. 590; 75 Am. Jur. 2d, Trial, § 788. For these reasons, we find that the trial court did not err in charging the jury concerning the defendant's flight.

## C

Finally, the court's charge to the jury included a verbatim recital of the statute pertaining to criminal accessories, General Statutes § 53a-8, along with a mention of other "participants" in a crime. The jury were warned: "The fact that in this case only one alleged participant is being tried, although there may be others or another, should not cause you any trouble if you find that the accused actually was either an active principal or an accessory, as I have explained those terms to you." The defendant claims that this portion of the charge was erroneous since there was no evidence pertaining to accessories or "other participants." We find no merit to this claim.

The indictment charges that the defendant had caused the death of Moran while "acting with one or more persons in committing or attempting to commit robbery," and the statute under which he was indicted speaks explicitly of "another participant" in the felony murder. General Statutes § 53a-54 (a) (2). Furthermore, the jury heard evidence from Officer Velazco that Carmen Sanchez had encouraged the defendant to hit Moran with the pipe and take his money. Under these circumstances, we find no error in the court's charge.

There is no error.

In this opinion the other judges concurred.