STATE OF CONNECTICUT *v.* GARY COOKE
(AC 25452)

Dranginis, Bishop and McLachlan, Js.

Argued January 11—officially released June 14, 2005

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Joseph T. Corradino*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, *John C. Smriga*, supervisory assistant state's attorney, and *John P. Marini*, certified legal intern, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Gary Cooke, appeals from the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c,[1] attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (2),[2] unlawful restraint in the first degree in violation

---

[1] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[2] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were

of General Statutes § 53a-95,[3] robbery in the first degree in violation of General Statutes § 53a-134 (a) (2),[4] and larceny in the third degree in violation of General Statutes §§ 53a-119 and 53a-124 (a) (2).[5] On appeal, the defendant claims that (1) there was insufficient evidence to convict him of felony murder because the death of Juan Moreno Castillo was not "in the course of" or "in furtherance of" the robbery, (2) the trial court incorrectly instructed the jury regarding the necessary causal relationship between the underlying felony and the murder, (3) the court incorrectly instructed the jury regarding the second element of felony murder, which was whether the death of the victim must have been caused by a participant in the robbery, and (4) the court improperly admitted into evidence the prior inconsistent statement of a Spanish speaking witness without proper authentication. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On November 20, 2001, the defendant, along with

as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

General Statutes § 53a-134 (a) provides in relevant part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

[3] General Statutes § 53a-95 (a) provides: "A person is guilty of unlawful restraint in the first degree when he restrains another person under circumstances which expose such other person to a substantial risk of physical injury."

[4] See footnote 2.

[5] General Statutes § 53a-119 provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

General Statutes § 53a-124 (a) provides in relevant part: "A person is guilty of larceny in the third degree when he commits larceny, as defined in section 53a-119, and . . . (2) the value of the property or service exceeds one thousand dollars . . . ."

his fellow perpetrators, Javier Santana and Abimeal Quinones, entered a garage party at 68 Alice Street in Bridgeport wearing masks and armed with guns, ordered the guests[6] to lie face down on the ground and instructed them to remove their belongings. The perpetrators began taking money, jewelry and other items from the guests and placing them in a bag. The perpetrators threatened that if anyone moved or looked up, they would be killed. After approximately twenty minutes, two officers from the Bridgeport police department, Gilbert Delvalle and Leonard Alterio, arrived at the garage, announced their presence and opened the door to the garage. As the officers opened the door, gunshots were fired from inside the garage. Both Alterio and Delvalle returned fire into the garage and backed away. During the exchange, Delvalle shot Quinones, who fell to the ground and later died. The victim, who was a guest at the party, was also shot and killed.

Approximately twenty minutes after the gunfire began, the defendant and Santana surrendered. Santana was the first out of the garage, carrying an AK-47 type weapon. The defendant followed shortly thereafter. Upon entering the garage, the police found approximately thirty-five people lying down and a red nylon bag containing cash, jewelry and wallets. The bodies of the victim and Quinones were also discovered. Ballistics evidence showed that the AK-47 weapon Santana carried was the only weapon fired by any of the perpetrators and that the bullet that killed the victim was fired from an AK-47.

The defendant was arrested and charged in a fifty-six count substitute information with felony murder, robbery in the first degree, unlawful restraint in the first degree, attempt to commit robbery in the first

---

[6] Hereinafter, the people who were at the party, including the homeowners, will be referred to as the "guests."

degree and larceny in the third degree. Following a joint jury trial, the defendant and Santana were found guilty on all counts. The defendant was sentenced to a total effective term of eighty-five years incarceration. This appeal followed.

I

The defendant first claims that there was insufficient evidence to prove that the death of the victim was committed "in the course of" and "in furtherance of" the robbery. The defendant contends that by the time the victim was killed, the robbery had been completed and, therefore, the jury could not have concluded "that the use of force was within the sequence of events directly connected to the robbery." We disagree.

"The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Montgomery*, 254 Conn. 694, 732, 759 A.2d 995 (2000).

"In order to obtain a conviction for felony murder the state must prove, beyond a reasonable doubt, all the elements of the statutorily designated underlying felony, and in addition, that a death was caused in the course of and in furtherance of that felony." (Internal quotation marks omitted.) *State* v. *Lewis*, 245 Conn. 779, 786, 717 A.2d 1140 (1998). General Statutes § 53a-133 provides: "A person commits robbery when, in the course of committing a larceny, he uses or threatens

the immediate use of physical force upon another person for the purpose of: (1) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or (2) compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the larceny." We now review whether there was sufficient evidence that the death occurred "in the course of" or "in furtherance of" the robbery.

## A

The defendant first argues that the killing did not occur "in the course of" the robbery because the robbery had ceased or had been completed by the time the victim was killed. The requirement that the death be "in the course of" the felony focuses on the temporal relationship between the killing and the underlying felony. See *State* v. *Ghere*, 201 Conn. 289, 297, 513 A.2d 1226 (1986). In *Ghere*, our Supreme Court held that even though the use of force occurred after the demand for money, the temporal requirement between the death and the robbery was met because "under General Statutes § 53a-133, if the use of force occurs during the continuous sequence of events surrounding the taking or attempted taking, even though some time immediately before or after, it is considered to be 'in the course of' the robbery or the attempted robbery within the meaning of the statute." Id., 297.

As indicated previously, robbery involves the use of force to take or to retain the property of another.[7] In this case, there was sufficient evidence that the use of force was not only an essential part of the plan of the defendant and the other perpetrators to take the property, but was also essential to the retention of the

---

[7] The defendant has not raised any claims with respect to his conviction of robbery or attempt to commit robbery.

property. The defendant and the other perpetrators entered the garage heavily armed and demanded that everyone get on the floor. They pushed, kicked and hit those who did not comply immediately, and stated that anyone who disobeyed their instructions would be shot. When the police arrived, the perpetrators prevented their entry into the garage by firing at the officers in the doorway. From this evidence, the jury reasonably could have concluded that the defendant and his cohorts were firing at the police officers as part of an effort to retain the property that they had stolen and to elude capture. Evidence regarding the circumstances of the victim's death also supports the conclusion that he was killed during the course of the robbery. The jury heard evidence that the victim picked up a gun and that when he stood with gun in hand in an apparent attempt to stop the perpetrators, he was shot and killed. On the basis of this evidence, there was a sufficient evidentiary basis from which the jury reasonably could conclude that the victim's death was caused during the commission of the robbery.

B

The defendant next argues that there was insufficient evidence for the jury to conclude that the victim's death occurred "in furtherance of" the robbery because the death resulted from an act of unjustified self-defense by Santana, which broke the necessary causal connection between the robbery and the death. "[T]he phrase 'in furtherance of' was intended to impose the requirement of a relationship between the underlying felony and the homicide beyond that of mere causation in fact, similar to the concept of proximate cause in the law of torts." (Internal quotation marks omitted.) *State* v. *Gomez*, 225 Conn. 347, 352, 622 A.2d 1014 (1993). The purpose of the requirement "was to limit the liability of a person whose accomplice in one of the specified felonies has performed the homicidal act to those circumstances

which were within the contemplation of the confederates to the undertaking, just as the liability of a principal for the acts of his servant is similarly confined to the scope of the agency." *State* v. *Young*, 191 Conn. 636, 642, 469 A.2d 1189 (1983).

We note that it is well settled that self-defense is not a recognized defense to felony murder when the underlying felony is armed robbery. See *State* v. *Amado*, 254 Conn. 184, 201, 756 A.2d 274 (2000); *State* v. *Lewis*, supra, 245 Conn. 812. As our Supreme Court stated in *Lewis*, "[o]ne who commits or attempts a robbery armed with deadly force, and kills the intended victim when the victim responds with force to the robbery attempt, may not avail himself of the defense of self-defense." (Internal quotation marks omitted.) *State* v. *Lewis*, supra, 812. Further, in *Amado*, the court elaborated, stating that "[the] holding is consistent with the purpose underlying felony murder, which is to punish those whose conduct brought about an unintended death in the commission or attempted commission of a felony. . . . The felony murder rule includes accidental, unintended deaths. Indeed, we have noted that crimes against the person like robbery, rape and common-law arson and burglary are, in common experience, likely to involve danger to life in the event of resistance by the victim . . . . Accordingly, when one kills in the commission of a felony, that person cannot claim self-defense, for this would be fundamentally inconsistent with the very purpose of the felony murder [statute]." (Citation omitted; internal quotation marks omitted.) *State* v. *Amado*, supra, 201.

In this case, the defendant does not argue self-defense as a bar to prosecution for the death of the victim. Rather, he claims that if Santana shot the victim even in unjustifiable self-defense, the act was not in furtherance of the robbery. Thus, he claims, the shooting, even though unjustified, does not fit the parameters of felony

murder. We are unpersuaded. In this case, the prosecution presented evidence that the defendant and the other perpetrators entered the garage heavily armed, threatened the guests and physically forced several of the guests to the ground. When the police arrived, the perpetrators fired their weapons to prevent the police from entering the garage. Similarly, when the victim stood up, he was shot by one of the perpetrators. On the basis of the testimony at trial regarding the ongoing use of the weapons before and after the police arrived, it was reasonable for the jury to conclude that the defendant and the other perpetrators had contemplated the killing of an innocent guest during the commission of the robbery. Additionally, the testimony provided that the victim's death occurred shortly after (1) the defendant and the other perpetrators threatened the guests with guns and took their property, (2) the perpetrators fired on the police to avoid being captured and (3) the victim apparently disobeyed the perpetrators' orders by standing with a gun in his hand. Under these circumstances, we conclude that the testimony provided sufficient evidence for the jury to conclude that the killing of the victim occurred "in furtherance of" the robbery.

## II

The defendant next raises two claims regarding the propriety of the court's jury instructions. "The standard of review for an improper instruction on an element of an offense is whether it is reasonably possible that the jury was misled. . . . In determining whether it was indeed reasonably possible that the jury was misled by the trial court's instructions, the charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding [it] to a correct verdict in the case. . . . The charge is to be read as a whole and individual instruc-

tions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . The charge must be considered from the standpoint of its effect on the jury in guiding [it] to a proper verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Gayle*, 64 Conn. App. 596, 605, 781 A.2d 383, cert. denied, 258 Conn. 920, 782 A.2d 1248 (2001).

A

The defendant first claims that the court's instructions regarding felony murder[8] were improper because

[8] The court instructed the jury as follows: "Felony murder. Each defendant is charged with the crime of felony murder in violation of the penal code, which provides as follows: A person is guilty of murder when, acting either alone or with others or with one or more persons—let me read it again. A person is guilty of murder when, acting either alone or with one or more persons, he commits robbery in the first degree and in the course of and in furtherance of such crime or of flight therefrom, he or another participant, if any, causes the death . . . of a person other than one of the participants.

"For you to find the defendants guilty of this charge, the state must prove the following elements beyond a reasonable doubt: One, that the defendants acting alone or with one or more other persons committed the crime of robbery in the first degree, as it is subsequently defined and I will define it for you. Two, that the defendants or another participant in the crime of robbery in the first degree caused the death of another person. Three, that the defendants or another participant caused the death while in the course of and in the furtherance of the commission of the crime of robbery in the first degree or in flight therefrom. This means that during the commission of the robbery and in the course of carrying out its objective, the death was caused or the chain of events, such as the shooting resulting in the death, was set in motion. A felony murder embraces any killing committed by one of the criminals in the attempted execution of—execution of the unlawful end. And, four, that the victim was not a participant. A participant is one who takes part or shares in the underlying crime.

"By this law, the legislature has provided that when during the actual commission of robbery in the first degree or in the immediate flight therefrom the perpetrator causes the death of another person, the perpetrator is guilty of felony murder. It does not matter that the act that caused the death was committed unintentionally or accidentally rather than with the intention to cause death. Nor does it matter if the death was the result of the victim's fear or flight. The perpetrator is as guilty when committing this form of

they did not define and explain properly the requirements that the death must have occurred "in the course of" or "in furtherance of" the robbery. The defendant specifically attacks the following portion of the instructions: "This means that during the commission of the robbery and in the course of carrying out its objective, the death was caused or the chain of events, such as the shooting resulting in the death, was set in motion. A felony murder embraces any killing committed by one of the criminals in the attempted execution of—execution of the unlawful end." We review each of the defendant's claims in turn.

The defendant first claims that the court did not instruct the jury that the death must have occurred during the taking or attempted taking and, therefore, did not explain adequately the "in the course of" element of felony murder. As stated previously, the "in the course of" element of the felony murder statute requires the jury to find that the killing occurred within a temporal sequence that was near to the commission of the robbery. Our Supreme Court has defined the phrase "in the course of" to include the period immediately before or after the actual commission of the crime. *State* v. *Gomez*, supra, 225 Conn. 352.

In the present case, the court adequately instructed the jury that the death must have been within a temporal sequence immediately before or after the commission of the crime because the court explained that the death must have been caused "during the commission of the robbery and in the course of carrying out its objective

murder as he would be if he had intentionally committed the act that caused the death.

"If you find that the state has proved beyond a reasonable doubt each of the elements of murder—of felony murder, then you . . . shall find the particular defendant guilty. On the other hand, if you find that the state has failed to prove beyond a reasonable doubt any one of the elements, you shall find that particular defendant not guilty."

. . . ." The court also stated that the death must have occurred "during the actual commission of robbery in the first degree . . . ." Reading the jury charge as a whole, we believe it was faithful to the law and appropriate to the circumstances. There is no basis for a determination that the jury could have been misled by the court's instruction to believe that even if the death had not occurred during the course of the robbery, the defendant still could be convicted of felony murder.

The defendant next claims that the court did not instruct the jury adequately that the death must have been related causally to the commission of the underlying felony and therefore did not explain adequately the "in furtherance of" element of felony murder. We disagree.

Our Supreme Court considered a similar challenge in *State* v. *Young,* supra, 191 Conn. 639–40, in which the defendant claimed that the trial court incorrectly instructed the jury by including language that the death occurred "in the natural progression" of the felony. In affirming the conviction, the Supreme Court discussed the required element that the death must have occurred "in furtherance of" the felony. Id., 641–43. The court held that the element required "[m]ore than the mere coincidence to time and place . . . the nexus must be one of logic or plan. Excluded are those deaths which are so far outside the ambit of the plan of the felony and its execution as to be unrelated to them." (Internal quotation marks omitted.) Id., 641. The court continued: "A felony murder embraces not any killing incidentally coincident with the felony . . . but only those committed by one of the criminals in the attempted execution of the unlawful end . . . . Although the homicide itself need not be within the common design . . . the act which results in death must be in furtherance of the unlawful purpose. . . . [T]he phrase in furtherance of was intended to impose the requirement of a relation-

ship between the underlying felony and the homicide beyond that of mere causation in fact, similar to the concept of proximate cause in the law of torts." (Citation omitted; internal quotation marks omitted.) Id., 642.

The question we must answer in this instance is whether the court's instructions adequately informed the jury that the defendant could be found guilty of felony murder only if the jury found beyond a reasonable doubt that the death was related causally to the robbery or whether it was reasonably possible that the jury was misled by the instructions. The defendant claims that the instructions could have misled the jury to find him guilty of felony murder as long as the death occurred within the chain of events started by the robbery, even if the killing was completely unrelated to the robbery.

Our review of the court's instructions leads us to conclude that the court adequately instructed the jury that the death must have been related sufficiently to the robbery by informing the jury that the act of killing must have been for the purpose of advancing the commission of the robbery. In its instructions, the court stated that death must have been "in furtherance of" the robbery. "Furtherance" is defined as: "Act of furthering, helping forward, promotion, advancement, or progress." Black's Law Dictionary (6th Ed. 1990). Thus, the court's use of the term "furtherance," by definition, informed the jury of the causal relationship between the robbery and the killing required for a conviction of felony murder. Additionally, the court's definition of "furtherance," which was that the death must be caused during a chain of events set in motion in the course of carrying out the robbery, served to amplify the court's instruction to the jury that the death must be linked causally to the felony. See, e.g., *State* v. *Gayle*, supra, 64 Conn. App. 603–607 (upholding court's instruction that "[t]his means that during the commission of the

attempted robbery and in the course of carrying out its objective, the death was caused or the chain of events such as the shooting resulting in the death was set in motion" [internal quotation marks omitted]). Although the defendant recognizes that the *Gayle* court embraced an instruction similar to the one at hand, he argues that the trial court in *Gayle* gave amplifying instructions clarifying the "in furtherance of" element, which were absent from the jury instructions in this instance.[9] Although we recognize that the instructions in this case do not contain the additional comments made by the court in *Gayle*, we believe the court's instructions in this instance adequately explained the nexus requirement of the felony murder statute and that the jury reasonably could not have been misled. The issue we decide is not how fully the court explained terms essential to its charge, but rather, whether the instructions provided by the court were accurate and adequate. "While the instructions need not be exhaustive, perfect or technically accurate, they must be correct in law, adapted to the issues and sufficient for the guidance of the jury." (Internal quotation marks omitted.) *Richmond* v. *Ebinger*, 65 Conn. App. 776, 779, 787 A.2d 552 (2001). In this instance, because the court's instructions were correct and adequate, the defendant's claim fails.

B

The defendant next claims that the court failed to instruct the jury adequately that in order to find that

[9] In *Gayle*, the trial court instructed the jury regarding the "in furtherance of" element as follows: "The third element of felony murder is that the death was caused in the course of and in furtherance of the attempted robbery. This means that during the commission of the attempted robbery and in the course of carrying out its objective, the death was caused or the chain of events such as the shooting resulting in the death was set in motion. In furtherance of an attempted robbery means the killing must be causally related to the attempted robbery. If one commits the attempted robbery, [and] the natural and probably consequences of which involve the consequences of taking a life, that person is responsible for a homicide committed while acting in pursuance of the attempted robbery if he caused the death

he had committed felony murder, the jury must find beyond a reasonable doubt that he or one of the other perpetrators killed the victim. The defendant argues that the instructions were ambiguous because they did not preclude the possibility that the jury could convict him even if it believed that a police officer may have shot the victim. This argument is centered on the court's instruction that the jury may find that "the death was caused or the chain of events, such as the shooting resulting in the death, was set in motion." The defendant argues that, on the basis of this instruction, the jury could have found him guilty of felony murder if it found that he or one of the other perpetrators started a chain of events that led to a police officer accidentally shooting and killing the victim. The defendant's argument is premised on the assertion that there was sufficient evidence from which the jury could have inferred that the victim died from gunshots fired by the police. Therefore, he claims, the ambiguous instruction violated his due process rights by allowing a conviction on legally insufficient grounds.

Upon our review of the court's entire charge, and in light of the trial evidence, we cannot conclude that the jury was misled by the court's instructions. On several occasions during its charge, the court reiterated the statutory language that the death must have been *caused by* one of the perpetrators.[10] Additionally, the

during the attempted robbery." (Internal quotation marks omitted.) *State* v. *Gayle*, supra, 64 Conn. App. 603–604.

[10] The court instructed the jury as follows: "A person is guilty of murder when, acting either alone or with one or more persons, he commits robbery in the first degree and in the course of and in furtherance of such crime or of flight therefrom, *he or another participant, if any, causes the death . . .* of a person other than one of the participants. . . . Two, that *the defendants or another participant in the crime of robbery in the first degree caused the death of another person.* Three, that the *defendants or another participant caused the death* while in the course of and in furtherance of the commission of the crime of robbery in the first degree or in flight therefrom. . . . By this law, the legislature has provided that when during the actual commission of robbery in the first degree or in the immediate flight therefrom, the

court instructed the jury that felony murder encompasses "any killing *committed by* one of the criminals . . . ." (Emphasis added.) Any ambiguity that may have been caused by the portion of the charge cited by the defendant was clarified sufficiently by the court's later admonition that felony murder embraces killing actually *committed by* the defendant or by another perpetrator.

The defendant's criticism of the court's use of the phrase "chain of events" is similarly unavailing. As indicated in part II A, this language was used by the court to enunciate that the death must occur "in furtherance of" the felony. When that language is viewed in isolation, one could argue, as the defendant has, that a person could be found guilty of any death caused during the chain of events that resulted from the robbery. This portion of the charge must been read, however, in light of the court's entire charge, which, as noted, made clear to the jury that, in order to convict the defendant of felony murder, the jury must find that he or one of the other perpetrators "caused" the death and that the killing must have been "committed by one of the criminals . . . ." We conclude that the jury instructions were correct as a matter of law.

## III

The defendant finally claims that the court improperly admitted a translated statement of Mario Flores, a trial witness, on the ground that the statement lacked authentication. The court admitted the statement over the defendant's objection. Therefore, this evidentiary claim has been preserved properly for our review. The defendant now argues that the admission of the statement was improper and constitutes reversible error because the statement "was detrimental to [his] theory

*perpetrator causes the death of another person*, the perpetrator is guilty of felony murder." (Emphasis added.)

of defense, compelling [him] to adopt an alternative theory that most likely weakened his entire defense."

Additional facts are necessary to resolve the defendant's claim. At trial, Flores testified that he saw the victim fall after apparently being shot, but he did not know from which direction the gunshots had been fired. He also testified that he did not see Quinones get shot. On cross-examination, Santana's counsel sought to refresh Flores' recollection with a prior written statement he had given to the police on December 2, 2001. In his statement, Flores indicated that he saw the victim and Quinones get shot at the same time from gunshots fired from the same direction.

When Santana's counsel attempted to introduce the statement as a full exhibit pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), the defendant's counsel objected on the ground that the statement was not authenticated. Counsel argued further that Flores, who did not speak or read English, was not able to testify that the statement, written in English, was an accurate transcription of the oral answers he had given to the police. On voir dire, Flores testified that he spoke Spanish but not English and that at the police station, an English speaking officer had directed questions to him, which a bilingual (Spanish and English) interpreter[11] then translated into Spanish for Flores to answer. After Flores answered the questions, the interpreter translated his answers into English, and the police officer, who did not speak or understand Spanish, wrote the answers, which, once compiled, comprised Flores' statement. After the statement was completed, the interpreter had read it back to him in Spanish. Flores then signed the statement as his own. At trial, once the court heard these circumstances and

---

[11] It is unclear whether the interpreter was a police officer.

Flores was able to identify the signature on the proffer as his own, the court admitted the statement into evidence.[12] Neither the prosecution nor Santana's counsel, who each had proffered the statement as a full exhibit under *Whelan*, called the interpreter to testify regarding the authenticity of the statement as written.

Our review of a trial court's evidentiary decisions is limited to whether the court abused its discretion. See *State* v. *Ferraiuolo*, 80 Conn. App. 521, 534–35, 835 A.2d 1041 (2003), cert. denied, 267 Conn. 916, 841 A.2d 220 (2004). "Authentication is . . . a necessary preliminary to the introduction of most writings in evidence . . . . In general, a writing may be authenticated by a number of methods, including direct testimony or circumstantial evidence. . . . Both courts and commentators have noted that the showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. . . . Rather, there need only be a prima facie showing of authenticity to the court. . . . Once a prima facie showing of authorship is made to the court, the evidence, as long as it is otherwise admissible, goes to the jury, which ultimately will determine its authenticity. . . . The requirement of authentication . . . is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." (Citation omitted; internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 188–89, 864 A.2d 666 (2004); see Conn. Code Evid. § 9-1 (a).

---

[12] During trial, it was unclear whether the statement came into evidence as a prior inconsistent statement for the sole purpose of attacking the credibility of the witness or whether it was admitted for its truth under § 8-5 (1) of the Connecticut Code of Evidence and *State* v. *Whelan*, supra, 200 Conn. 753. Initially, the court allowed it as a "full exhibit," but later stated: "My ruling is as a prior inconsistent statement." Because there was no limiting instruction to the jury, we will assume that the statement came into evidence as a full exhibit.

In order for a translated statement to be authenticated, there must be sufficient evidence from which the trial court reasonably could conclude that the document was what it was claimed to be. *State* v. *Colon,* supra, 272 Conn. 189–90; see also *State* v. *Torres,* 85 Conn. App. 303, 317–18, 858 A.2d 776, cert. denied, 271 Conn. 947, 861 A.2d 1179 (2004). In *State* v. *Colon,* supra, 188, the court addressed a claim similar to that presently advanced by the defendant. In *Colon,* the defendant attempted to suppress a statement that he had made to a police lieutenant through a bilingual police officer. Id., 189. At trial, the statement was offered during the testimony of the bilingual officer, who stated that during the interview, the lieutenant asked him questions, which he translated and asked the defendant, and that once the defendant answered the questions in Spanish, the bilingual officer orally stated the defendant's responses in English to the lieutenant, who, in turn, wrote the answers in English. Id. In addition, the bilingual officer testified that once he confirmed that the lieutenant had transcribed the defendant's answers to the lieutenant's questions correctly, the bilingual officer then read the entire statement in Spanish to the defendant, who signed it. Id. In concluding that the statement was admissible, the court distinguished *State* v. *Rosa,* 170 Conn. 417, 426, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976), because, unlike in *Rosa,* the *Colon* interpreter testified at trial, thereby subjecting himself to cross-examination regarding his translation. *State* v. *Colon,* supra, 191.

In the present case, the interpreter was not called to testify. Therefore, the statement attributed to Flores could not be authenticated as an accurate transcription. Unlike *Colon,* in which the interpreter actually testified "regarding both his translation and his identification of the document as the statement that the defendant had given on the night of his arrest"; id.; Flores could not

confirm sufficiently that the statement, which was introduced at trial in the English language, was a fair and accurate translation of the oral statement he made to police. By not hearing testimony from the interpreter, the court was deprived of an opportunity to confirm that the oral statement given by Flores in December, 2001, accurately reflected the proffered written statement.[13]

Not every evidentiary misstep, however, warrants a new trial. For the defendant to prevail on his claim, he must show that the error was harmful. *State* v. *Gonzalez*, 272 Conn. 515, 527, 864 A.2d 847 (2005). "In order to establish the harmfulness of a trial court ruling, the defendant must show that it is more probable than not that the improper action affected the result." (Internal quotation marks omitted.) *State* v. *Russo*, 62 Conn. App. 129, 137, 773 A.2d 965 (2001). Whether an improper evidentiary admission "is harmless in a particular case depends upon a number of factors, such as the importance of the [disputed evidence] in the prosecution's case, whether the [evidence] was cumulative, the presence or absence of evidence corroborating or contradicting the [disputed evidence] on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

---

[13] At a minimum, the proffering party is required to produce the interpreter to confirm that the witness' statements were accurately transcribed. We note that having a party or witness who speaks only Spanish in a case may not be a rare occurrence. Indeed, "Latinos/Hispanics have an incarceration rate in Connecticut that is above the national average. Connecticut incarcerates 1,439 per 100,000 Latinos/Hispanics compared to the national average of 759 per 100,000 of the population." See State of Connecticut, Commission on Racial and Ethnic Disparity in the Criminal Justice System, Annual Report and Recommendations 2003-2004. To the extent that these statistics demonstrate the likely participation by Latinos in the criminal justice system in significant numbers, it is not mere whimsy to suggest that due process considerations may require the criminal justice process to accommodate itself to witnesses and defendants for whom English may not be a familiar language.

. . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) *State* v. *Gonzalez*, supra, 527–28.

The defendant claims that "[t]he written statement was detrimental to [his] theory of defense, compelling [him] to adopt an alternative theory that most likely weakened his entire defense." The defendant contends that this weakened his entire defense because his primary theory of defense was that another participant in the robbery had shot the victim in self-defense and not in furtherance of the crime. Flores initially testified the victim wanted to "fight with [the robbers]," thereby supporting the defense that Santana shot the victim after Quinones had been killed by the police. The defendant argues that Flores' trial testimony supported the defendant's theory that the killing was not in furtherance of the robbery because it was an act of unjustified self-defense, separable from the circumstances of the robbery or, in the alternative, that the victim was shot accidentally by a police officer. The defendant claims that the admission of the statement given to the police by Flores contradicted these alternate theories and weakened the defense.

As discussed in part I B, the defendant's theory of unjustified self-defense legally is ineffectual. See *State* v. *Amado*, supra, 254 Conn. 201. Additionally, and notwithstanding the defendant's argument to the contrary, our review of the trial evidence reveals that the state clearly established that the bullet retrieved from the victim's body came from an AK-47, a weapon carried only by the assailants. Therefore, notwithstanding the incorrect admission of the Flores statement, it caused the defendant no legal harm because the statement served only to erode the defendant's claim that the

victim may have been shot in an act of unjustified self-defense or accidentally by the police. "It is inconsistent with the purpose of the felony murder statute to allow a defendant who causes a death in the course of a felony to claim self-defense because the victim attempted to thwart such a felony." Id., 202. Because this defense is not recognized as a matter of law and because the evidence clearly established that the bullet retrieved from the victim came from a firearm carried by one of the perpetrators, we conclude that the decision to allow the prior statement of Flores as a full exhibit was harmless beyond a reasonable doubt.

The defendant also argues that the failure of the interpreter to testify deprived him of his right to confrontation because he was unable to examine the interpreter to determine whether the statement introduced at trial was an accurate translation of what Flores told the interpreter. The defendant did not raise this constitutional issue at trial. Reviewing this claimed constitutional violation under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989),[14] we hold that the admission of the statement was harmless beyond a reasonable doubt. The defendant, therefore, cannot satisfy the fourth condition of our review and, therefore, the *Golding* claim must fail.

---

[14] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; internal quotation marks omitted.) *State* v. *Mussington*, 87 Conn. App. 86, 91–92, 864 A.2d 75, cert. denied, 273 Conn. 914, 870 A.2d 1084 (2005).